**A. P. HOPKINS CORPORATION, a Michigan corporation, Plaintiff,**

v.

**STUDEBAKER CORPORATION, ONAN DIVISION, a Michigan corporation, et al., Defendants.**

**Civ. A. No. 29403.**

United States District Court,
E. D. Michigan, S. D.

Dec. 29, 1972.

---

Joseph W. Louisell and Philip A. Gillis, Detroit, Mich., for A. P. Hopkins Corp., a Mich. Corp.

Carson C. Grunewald, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., for Studebaker Corp., Onan Division, a Michigan Corp.

Edmund M. Brady, Jr., Vandeveer, Doelle, Garzia, Tonkin & Kerr, Detroit, Mich., for Carroll-Stuart Corporation, a Michigan Corp.; Arthur B. Stuart, Stewart R. Kaufman and Harry M. Hennequin.

OPINION

FREEMAN, District Judge.

This is an action to recover treble damages for violations of the anti-trust laws. Jurisdiction is alleged under 15 U.S.C. §§ 1, 4, 13(a), 15, 22 and 26.

The principal defendant in this litigation, the Studebaker Corporation, Onan Division, manufactures engine driven generators which are sold to selected distributors throughout the country. The generators, or plants, as they are sometimes called, range in power from one kilowatt to 450 kilowatts and are used to produce stand-by power for various purposes including use on construction sites and in hospitals. Onan also manufactures parts for generators. The plaintiff, A. P. Hopkins Corporation, was a distributor of Onan products from 1958 to 1965 in the eastern half of lower Michigan, selling both plants and parts.

Plaintiff, A. P. Hopkins Corporation, and defendant, Studebaker Corporation, Onan Division, hereinafter referred to as "Onan", entered into a Distributor Sales Agreement on February 28, 1961, which was terminated by letter of May 28, 1965. Carroll-Stuart Corporation succeeded plaintiff following the termination of the plaintiff as Onan's distributor in this area. Defendant Arthur B. Stuart was one of the incorporators of that firm. Defendants Stewart R. Kaufman and Harry M. Hennequin were former employees of the plaintiff who became employees of the Carroll-Stuart Corporation upon its formation as an Onan distributor.

The gravamen of plaintiff's complaint is that the defendants conspired to drive

the plaintiff out of business by engaging in certain practices. In the pretrial order filed in this case, the plaintiff set out the following allegations of wrongful conduct by the defendants. First defendants are accused of interfering with plaintiff's customers and contracts negotiated with those customers. Secondly, plaintiff asserts that the defendants, together with other Onan distributors, arbitrarily and capriciously refused to sell Onan products to plaintiff. Thirdly, defendant Onan is accused of establishing exclusive distributorships with illegal territorial restrictions on the sale of Onan products. Fourth, plaintiff accuses the defendants and other distributors of Onan products not named as defendants of selling to plaintiff at discriminatorily high prices in an effort to drive the plaintiff out of business. Fifth, plaintiff alleges that there was a conspiracy by defendants to hire away the employees of the plaintiff. Sixth, plaintiff alleges a breach of the Distributor Sales Agreement and the Service Station agreement in effect between the parties. Seventh, plaintiff alleges price fixing in violation of anti-trust laws.

Plaintiff's allegation of a breach of the agreements between the parties was not discussed in the trial brief submitted to this court. Nor was the matter of breach of any agreement set forth in the proposed findings of fact and conclusions of law. Moreover, no evidence presented at trial was directed to this allegation which we, therefore, consider abandoned.

Plaintiff asserts violations of 15 U.S. C. §§ 1 and 13(a). Under Section 1 of the Sherman Act every conspiracy in restraint of trade or commerce is illegal. According to plaintiff's allegations, defendant Onan conspired with its distributor Carroll-Stuart to drive the plaintiff out of business. As a part of this conspiracy plaintiff contends that the defendant Onan terminated plaintiff's distributorship; that Onan and Carroll-Stuart conspired together to prevent the plaintiff from purchasing Onan products from the defendants or any of Onan's other distributors; that when the defendants and other Onan distributors did sell to the plaintiff, it was at discriminatory prices; that defendants interfered with plaintiff's customers and contracts with customers; and that defendants lured away all of plaintiff's employees.

A group boycott or a concerted refusal by traders to deal with other traders is not permissible under the Sherman Act. Thus, in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the court found violations of Sections 1 and 2 of the Sherman Act where the evidence clearly showed a group boycott against sales to the plaintiff. In that case plaintiff Klor's was a retail establishment that sold appliances. Defendant Broadway-Hale, a retail chain of department stores, operated a store next door to Klor's that competed with Klor's in the sale of appliances. The court found that manufacturers and distributors of many major brands of appliances had conspired among themselves and with Broadway-Hale "either not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms." The defendants admitted such practices. However, they sought to justify their actions. But the court said that group boycotts are in "the forbidden category", and cannot be saved by allegations that they are reasonable or that they failed to accomplish any illegal end such as price fixing, or restraint of competition. In addition, the court stated that the concerted refusal to deal carried with it by its nature and character a tendency toward monopoly. The court also pointed out that the boycott would not be tolerated merely because it would destroy only one merchant. Thus from the Klor's case it is clear that a concerted refusal to deal with one retailer by manufacturers and distributors at the behest of another retailer is forbidden. It is also significant for purposes of the case at bar to note that one member of the conspiracy in Klor's was a competitor of the plaintiff. The court distin-

guished the forbidden group boycott from the situation where one trader refuses to deal with another and from the situation where one manufacturer and one dealer agree to an exclusive distributorship which are not forbidden.

■ Of course, the Klor's case can be distinguished from the case at bar in that only one manufacturer and its distributors are accused of conspiring against the plaintiff and not several different manufacturers as was true in Klor's. Nevertheless, it is clear that such a distinction is not pertinent in a case involving group boycotts. Thus, in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the court disapproved of the efforts of Parke, Davis to gain compliance of its distributors with a plan to fix the prices at which retail drugstores would sell Parke, Davis products. Thus the fact that only one manufacturer is involved in the alleged conspiracy does not place the defendants beyond the reach of the interpretation of the Sherman Act set forth in Klor's.

In United States v. General Motors Corporation, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the court found a violation of Section 1 of the Sherman Act where it was shown that General Motors together with its car dealers had conspired to prevent discount houses from selling certain automobiles manufactured by the General Motors Corporation. In General Motors, the court discussed the Klor's case and found it to be authority for its decision. The court went on to state following its discussion of Klor's and several other cases concerning group boycotts that

> The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct.

In other words the court made clear that concerted refusals to deal are illegal on their face.

In Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966), a case relied upon by plaintiff, the defendant manufacturer was found to have entered into agreements with its dealers to prevent the plaintiff from obtaining "factory Fords," late model automobiles driven by Ford employees on company business and then sold through regular Ford dealers. There was strong evidence in this case to support the jury's conclusion. Defendant sent a letter to its dealers stating that future sales of factory Fords to wholesalers like plaintiff "cannot be tolerated". The Court of Appeals held that under their interpretation of the General Motors case, the agreements were "per se violations of the Sherman Act," p. 883.

Defendants apparently do not quarrel with this theory of legal liability. In the trial brief filed in this matter by defendant Onan and adopted by the other defendants, the argument directed to the allegation of the claim of refusal to deal is confined to presentation of facts and does not include any contradiction of plaintiff's theory of liability based on Klor's and Ford Motor.

■ We now direct our attention to the evidence presented at trial to determine whether in fact defendants can be found to have engineered a concerted refusal to deal in order to drive the plaintiff out of business. It is clear from the testimony that subsequent to Onan's letter terminating plaintiff as its distributor, Onan filled those orders placed prior to termination. These were filled during the month of June. However, upon inquiry for parts by plaintiff's secretary, Delores Zaluski, in July of 1965, Onan advised her to see the local Onan distributor. Nevertheless, Onan did fill about sixteen orders for plaintiff after July 1, 1972. See DX5–14 and 17–22. But apparently after filling two orders in August and one in October, there were no further direct sales from Onan to plaintiff. If this sequence of activity is considered to be a refusal by Onan to deal with the plaintiff, the termination and the subsequent refusal by Onan to

...

deal with the plaintiff in and of themselves do not constitute violations of the anti-trust laws. As noted above, in the Klor's case the court distinguished cases of a simple refusal to deal between two traders from the kind of group refusal to deal described in Klor's.

Defendants cite the case of Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir, 1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166, in which the court held that the termination of one distributor and the substitution of another distributor to the detriment of the first distributor did not amount to a violation of the Sherman Act. The court viewed that case as being a simple refusal to deal between two traders. The Sixth Circuit recently affirmed its holding in the *Ace Beer* case in Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138 (6th Cir, 1972).* We find *Ace Beer* to be controlling in this matter insofar as we are looking at a simple refusal by Onan to deal with the plaintiff. Thus, we find no anti-trust violation as to the termination standing alone.

Nevertheless, the crucial question in this case is whether or not the termination was part of a plan to prevent the plaintiff from obtaining any Onan products from any source. As to Onan's distributors, the evidence clearly shows that they did sell Onan products to the plaintiff. Carroll-Stuart, the distributor which replaced plaintiff, sold Onan products at various times to the plaintiff up to the time of trial. Stewart Kaufman, general manager of Carroll-Stuart, testified that he had never refused to sell any items to the plaintiff and he had never instructed any of the employees of the corporation, such as Mr. Urban, not to sell to the plaintiff. Kaufman also stated that Onan never placed any pressure on him not to sell to the plaintiff.

Harry Hennequin, a former salesman for Carroll-Stuart, testified that he handled several orders from plaintiff for generator plants. He also remembered giving plaintiff quotes on prices for other items although it was not on a regular basis.

Ed Urban, parts man for Carroll-Stuart from 1965 to the present, stated that he dealt with plaintiff many times. He testified that he had sold and traded parts with plaintiff. Urban testified that he would only refuse parts if Carroll-Stuart was low on a part and might need it for their own use. This was the policy for all customers, including the plaintiff.

Grant Stageberg, who was general manager for plaintiff from November 1966 to August 1967, testified that on at least two occasions he was unable to obtain parts from the defendant Carroll-Stuart but that he was able to obtain the parts requested by sending someone to Carroll-Stuart who did not appear to be connected with the plaintiff. Stageberg testified that in November of 1966, shortly after he joined plaintiff, he called Carroll-Stuart on behalf of the plaintiff and requested a particular part. He spoke with Mr. Urban who said that the part was not available. Stageberg then drove over to Carroll-Stuart, identified himself as being from Bob's Garage, and asked for the same part. He was sold the part by Mr. Urban.

On a second occasion, in November or December of 1966, Stageberg testified that he called Carroll-Stuart for some bearings needed to complete a repair job for the Dearborn post office. Urban told Stageberg that he was out of that part too. Stageberg then called the post office and told someone named Ziggy to call Carroll-Stuart for the part which plaintiff would then pick up. One Bob Harvey ultimately picked up the bearing which Carroll-Stuart had told Stageberg it did not have. Plaintiff's exhibit 34, an invoice from Carroll-Stuart, dated December 30, 1966, shows a sale of six

* We note that the opinion was not unanimous, each judge on the panel having filed a separate opinion. Nevertheless, this proposition set forth in the Ace Beer case was not their area of disagreement.

bearings to Bob Harvey. Stageberg also mentioned other instances where he was unable to obtain parts from Carroll-Stuart, but there was no indication that Carroll-Stuart actually had these parts.

Stageberg also stated that he bought less than $100 in parts from Carroll-Stuart while he was with plaintiff. In his deposition, taken while still employed by plaintiff, Stageberg stated that he was never unable to obtain Onan parts. However, the witness noted at trial that he was able to refresh his memory since the taking of his deposition by reviewing plaintiff's records.

Nevertheless, it is clear that Carroll-Stuart did sell to the plaintiff. The proofs show that plaintiff and Carroll-Stuart did $2400 worth of business between July 1965 and December 1965. A. P. Hopkins, sole stockholder of plaintiff, testified that he bought Onan products from Carroll-Stuart. Thus, plaintiff did obtain parts from Carroll-Stuart that Carroll-Stuart had in stock except in two instances. Although the business dealings between plaintiff and Carroll-Stuart diminished for a period of time, the volume subsequently increased.

Sales to plaintiff by other Onan distributors have also occurred. The Muskegon distributor of Onan products, Electric Equipment & Supply Company, began selling Onan parts and plants to plaintiff in January of 1966 and continued to sell to plaintiff until Electric Equipment decided to discontinue the Onan line. L. D. Thompson, president of Electric Equipment, stated that his termination with Onan was the result of strained relations with Onan, but was basically friendly. The termination was not related to their sales to plaintiff. Electric Equipment sold approximately $60,000 worth of parts and plants to plaintiff within a one-year period. Donald Earhart, Onan Zone Manager for Electric Equipment, complained to Thompson that Electric Equipment's sales to plaintiff were hurting the new distributor in Detroit. But Thompson said he never interpreted these statements as threats and he continued to sell to plaintiff despite Earhart's complaints. Stageberg and Hopkins confirmed the sales from Electric Equipment to plaintiff as did Robert LeMieux, an employee of Electric Equipment during the relevant period of time. Thus it is clear that Electric Equipment did not refuse to deal with plaintiff.

Plaintiff also sought to buy Onan products from Minnesota Onan, a distributor of Onan products located in Minneapolis, Minnesota, near Onan headquarters. One of the principal aspects of Minnesota Onan's business was the sale of obsolete Onan parts although they also handled sales of current parts. Grant Stageberg, who worked at Minnesota Onan from 1960 to 1966 as an engine repairman before going to work for plaintiff, testified that Minnesota Onan received an order from plaintiff for current parts on June 18, 1965. It is not clear what happened to this order. Thereafter Minnesota Onan did fill orders for plaintiff on a cash basis. But Stageberg testified that plaintiff's name did not appear on the books of the distributor. Stageberg testified, as did Mr. Hopkins, that one order from Minnesota Onan for $3600 of current parts was shipped via a friend of Mr. Hopkins, Ellertson Photo Supply. Mr. Hopkins testified that he used Ellertson as a cover for his purchases. He stated that it was not his idea to use Ellertson as consignee of the shipment. In September of 1966 shipments from Minnesota Onan ceased. Stageberg offered certain testimony as to statements made by William Flaherty, vice-president and general manager of Minnesota Onan regarding sales to plaintiff. Defendants objected to this testimony as being hearsay. Clearly, the testimony was hearsay. But the court admitted this testimony as to statements made by Flaherty only for the purpose of showing state of mind or motive, but not for the truth of the contents. However, if Flaherty is shown to be a part of a conspiracy, then the testimony would be ad-

missible as substantive proof against all co-conspirators as an admission against interest.

The following testimony was accepted only to show Flaherty's state of mind. Stageberg testified that Flaherty expressed hesitancy to deal with plaintiff. Flaherty allegedly objected to out-of-territory sales. In addition, Flaherty also wanted plaintiff's name kept off the books of Minnesota Onan. According to Stageberg, the placing of plaintiff's orders through Ellertson and other third persons was done at Flaherty's request.

Hopkins testified that when Flaherty finally refused to deal with the plaintiff, Flaherty stated that he had gone to Onan and done what he could, but that he could no longer deal with plaintiff.

In the deposition of William Flaherty taken in April of 1969 and introduced by defendants, Flaherty testified that he sold to plaintiff up until May of 1968 at which time he stopped dealing with plaintiff because the profit on these sales was too low. Flaherty testified that the use of Ellertson as consignee on the $3600 order was Mr. Hopkins' idea and that Flaherty did not know why sales were made through Ellertson. Flaherty also testified that he never talked to Onan about sales to plaintiff and he never heard anything from them. In addition, Flaherty stated that he never indicated that sales to plaintiff or sales outside of his territory would endanger his franchise.

Thus the evidence indicates that the distributor Minnesota Onan did deal with plaintiff for a period of time. During this time plaintiff bought $8200 worth of goods from Minnesota Onan. There is no direct evidence that defendant Onan in any way encouraged such termination.

Mr. Hopkins testified that the Cleveland distributorship represented by Mr. McDonald refused to deal with the plaintiff stating that he, McDonald, had heard about plaintiff's cancellation and didn't want to get involved.[1] When he was deposed in 1968, Mr. McDonald testified that he agreed to sell to plaintiff but that plaintiff never sent any orders. He further stated that Onan never told him not to sell to plaintiff.

Plaintiff also bought parts and plants through the Chicago distributor represented by Mr. Mages. Mr. Hopkins and Art Jordan testified to these sales. Purchases through the Chicago distributor had to be picked up in Chicago or shipped from Chicago to plaintiff at plaintiff's expense. No direct shipments from the Onan plant were made. But purchases from Mages were short lived. Jordan testified that he was called by either Mages or Nielsen, Mages' parts manager, and was told that Mages would not ship any more parts because "The heat is on."[2] Mages testified to the contrary on defendants' case that he stopped selling to plaintiff because the orders were too small. He also testified that all purchases from his distributorship went through Chicago and were not direct shipped.

Plaintiff also attempted to deal with Mr. Edwin L. Slone of the Cincinnati distributorship for Onan. According to plaintiff's exhibit 11, Mr. Hopkins placed an order for an Onan generator with Mr. Slone on November 26, 1965. That order was not filled by Slone. However, he did fill a separate order for parts submitted December 10, 1965. [PX49] In connection with the first order for the generator, Hopkins testified that he received a letter from Slone returning the purchase order form. The letter,[3] contents of which are set forth

1. This testimony of Mr. Hopkins admitted only to show state of mind.

2. This testimony admitted only to show state of mind of the declarant.

3. This testimony admitted only to show state of mind of the declarant.

in the margin,[4] stated that Earhart told Slone not to fill the order. Mr. Hopkins testified that he called Slone after receiving the letter and his purchase order from Mr. Slone. The contents of that conversation between Hopkins and Slone was admitted only to show the state of mind of the declarant, Mr. Slone.[5] Mr. Slone allegedly told Hopkins that Ehrhart saw the order for the plaintiff on the desk and told Slone not to send the order. Slone then refused to fill the order although he did fill a later order for the plaintiff for parts. Plaintiff did not do business with the Cincinnati distributorship following these episodes.

The defense introduced the deposition of Mr. Slone in which he stated that he invented the story about Earhart to preserve his friendship with Hopkins. Slone stated in his deposition that he decided that it was not in his best interest to sell to the plaintiff. Earhart denied ever making such a statement to Slone.

Plaintiff also attempted to purchase Onan products through the Pittsburgh distributorship. Hopkins spoke to a Mr. Shane of that firm. Hopkins talked with Shane and left an order with him in August of 1965. That order was filled. On September 1, 1965, Shane sent a letter [6] to plaintiff and enclosed plaintiff's purchase order for additional items together with a letter. Plaintiff did not thereafter deal with the Pittsburgh distributor. The contents of the letter, which are set forth in the margin, were admitted only for the purpose of showing the declarant's state of mind.

The letter from Shane to plaintiff stated that Onan had at first refused to ship the first order to the plaintiff and then agreed to ship that order, but no additional orders. Shane went on to say that under these circumstances, he did not want to deal with plaintiff because it might jeopardize his distributorship.

Arthur Jordan, a friend of Mr. Hopkins and a distributor of Kohler products, attempted to acquire some Onan products for plaintiff. He called an Indiana distributorship of Onan products and spoke to Mr. Stockberger. No sales were made by the Indiana distributorship to plaintiff. Jordan testified as to his conversation with Stockberger which again was admitted only to show state of mind of the declarant. Stockberger allegedly agreed to sell to Jordan but refused to sell to the plaintiff.

---

4. "AL—Sorry to have to return your order Al, but Don Earhart was in yesterday and laid the law down to us in regards to out of territory sales. As much as I would like to accommodate your needs, I cannot place our association with Onan in jeopardy.

 Please accept our apologies.

 Sincerely, Ed Slone."

5. No objection was made as to Mr. Earhart's alleged statements since he is an employee of the defendant Onan.

6. "Dear Al:

 Further reference is made to our recent conversations regarding the possibility of furnishing you with ONAN parts, etc. As stated, I mailed your order into ONAN for direct shipment to you. My reason for doing this was to more or less put up a trial balloon to see what their reaction would be. The result was that Mr. Ed Swenson telephoned me last Friday, August 27th, and discussed this order, stating that he had been informed by Bud Stano, Manager of the Parts Department, that the order would not be shipped. Upon receipt of this information I called Bud Stano on Monday, August 30th, and further discussed your order with him. At this time he agreed to ship this one order but refused to ship any further orders.

 Under the above conditions, I regret to advise that there is no way that we could possibly handle your business without placing ourselves in jeopardy as they most certainly would be able to check any future orders and may also question our own orders, as inasmuch as we have just received a Government contract for the Westcoaster Mailster equipment. I am sorry that this had to happen and regret that I could not be of any more help.

 We are herewith returning the large parts order sent us and trust you will be able to work out some solution.

 We hope to be able to visit you in Detroit at some date in the future.

 Sincerely yours,

 A. F. SHANE COMPANY

 /s/ A. F. Shane

 President"

In determining whether or not a conspiracy exists, plaintiff asserts that the court may infer a conspiracy from parallel behavior of the alleged co-conspirators. The plaintiff admits that parallel actions alone do not mandate a finding of an agreement or conspiracy. The theory which plaintiff asserts is often referred to as conscious parallelism.

This theory evolved from a line of cases beginning with Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) in which the Supreme Court stated that an agreement could be inferred from business conduct. In that case the court found evidence to support the existence of an actual agreement among the defendants to fix prices. Nevertheless, the court went on to say that even without proof of the actual agreement, an agreement could have been inferred from evidence of an invitation to participate in concerted action followed by conduct of the invitees indicating acceptance of the invitation. The court stated, "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." The court also attached significance to the fact that each distributor knew that others had accepted the invitation. In closing, the court said

It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

In United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the court sustained the lower court's finding of a horizontal conspiracy among distributors to fix prices. That finding was inferred from the pattern of price fixing disclosed in the record. The court approved of such an inference stating

"We think there was adequate foundation for [the finding] too. It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." (citing Interstate Circuit.)

■ Thus Interstate Circuit and United States v. Paramount Pictures clearly indicate that a conspiracy may be inferred from business behavior. But two requirements must be met. First, the defendants must have knowledge of the fact that concerted action was contemplated, and, secondly, defendants must then have adhered to the contemplated actions. See United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). Plaintiff asserts that the activities of the alleged co-conspirators were consciously parallel and would constitute the kind of business behavior from which an inference of conspiracy could be made.

Of course, the Supreme Court has clearly said in Theatre Enterprises, Inc. v. Paramount Film Distributing, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954) that the fact that traders knowingly engage in similar conduct does not per se constitute a violation of the Sherman Act. In that case the court affirmed the lower court's denial of plaintiff's motion for a directed verdict despite the parallel business behavior of the defendants. The evidence showed that plaintiff, who operated a suburban movie theatre, had approached the defendants, which were motion picture producers and distributors, about obtaining "first-run" pictures. Each of the defendants uniformly refused to grant such rights to the plaintiff and continued to adhere to their policy of restricting first-run pictures to the downtown theatres. There was no direct proof of an illegal agreement. Each of the defendants advanced similar economic reasons for not dealing with the plaintiff, and the court

thought these reasons sound. The court pointed out that the crucial question in plaintiff's complaint was whether or not the defendants had made an agreement, tacit or express, not to deal with the plaintiff. Moreover, the court agreed with the plaintiff that business behavior is "admissible circumstantial evidence from which the fact finder may infer agreement." But the court went on to say that parallel business behavior does not by itself conclusively establish a violation of the Sherman Act. Thus, the mere fact that defendants in *Theatre Enterprises* reacted to plaintiff's request in an identical manner was not sufficient to support a directed verdict of liability under the Sherman Act. However, the parallel conduct of the defendants together with the decrees handed down in the case of United States v. Paramount Pictures, 334 U.S. 131, 68 S. Ct. 915, 92 L.Ed. 1260 (1948), in which the same defendants were found guilty of conspiring together in restraint of trade in the moving picture business was sufficient to create an issue of fact for the jury. Under the Clayton Act these decrees could be used as prima facie evidence of conspiracy in a case involving the same area and the same period of time as the period involved in the decrees. Thus it is not clear whether or not proof of parallelism alone would have been sufficient to create a jury question. But where the parallel conduct is done with knowledge of each other, it would seem to fall under the rule set forth above, namely, that business behavior can be the basis for an inference of conspiracy.

At the close of plaintiff's case, defendants moved for a dismissal under Rule 41(b) of the Federal Rules of Civil Procedure claiming that upon the law and the facts presented, plaintiff had shown no right to relief. The court, as trier of the facts in a non-jury case, in considering such a motion, must "weigh and consider the evidence." 5 Moore's Federal Practice, ¶ 41.13 [4], (2d ed. 1971). At the trial of this case the court reserved its rulings on several of plaintiff's exhibits as well as certain testimony offered by plaintiff. These rulings must now be made since in a Rule 41(b) motion, the court must look only to the evidence at the close of plaintiff's case.

■ Plaintiff sought to introduce an alleged statement of Mr. Stano, parts manager for Onan, through the testimony of Grant Stageberg. The witness testified that while employed by the Minnesota-Onan distributorship, he went to Onan's factory around September of 1966 to attempt to obtain more parts for plaintiff. He talked with Bud Stano who said, "Keep your nose out." Defendants objected to this testimony on the basis that since Mr. Stano was deceased at the time of trial, M.S.A. § 27A.2166, M.C.L.A. § 600.2166, commonly referred to as the dead man's statute, would bar testimony of this kind. The statute in question provides in pertinent part as follows:

(1) In any action by or against a person incapable of testifying, a party's own testimony shall not be admissible as to any matter which, if true, must have been equally within the knowledge of the person incapable of testifying, unless some material portion of his testimony is supported by some other material evidence tending to corroborate his claim.

(2) . . . A "party's own testimony" includes the testimony of his agents, successors, assigns, predecessors or assignors.

Although Stageberg was an employee of plaintiff from November 1966 to August 1967, he was not an employee of plaintiff at the time of Stano's statement, nor at the time of his testimony at trial. Thus, we find that he was not an agent of plaintiff at the crucial times in question. Under the statute's definition in sub-paragraph two, his testimony does not constitute a "party's own testimony" and, therefore, the dead man's statute does not prohibit his testimony as to statements by Stano.

We also note, however, that we ascribe no bad motive to this statement of Stano. We do not read it as indicative of any attitude toward plaintiff.

In addition, the court reserved its ruling on two letters written by Ed Slone and A. F. Shane, contents of which are set forth in footnotes 4 and 6, supra. The letters were objected to by defendants as being hearsay. The court admitted the letters only to show the state of mind of the declarant. But plaintiff now urges that the letters be admitted for all purposes on additional theories.

■ Plaintiff argues that Slone's letter should be admitted to impeach statements made in his deposition introduced on defendants' case. But on a motion to dismiss we must look only to plaintiff's case. Since the deposition of Slone was not introduced until defendants' case, we cannot, on a motion to dismiss, admit Slone's letter under this theory. However, even if we were to admit the letter under plaintiff's theory, it would only be used for purposes of testing Slone's credibility.

■ Plaintiff argues that Shane's letter should be admissible as an admission against interest. However, until a conspiracy has been established, Shane's statement is no evidence of unlawful conduct. Defendants also objected to admission of the letter under M.S.A. § 27A.2166, M.C.L.A. § 600.2166, the Michigan dead man's statute, since Shane was deceased at the time of trial. The statute, however, only applies to parties, which includes corporations and their agents. Shane is not a party to this lawsuit, nor was he acting as Onan's agent when he wrote the letter. Thus the dead man's statute is not a bar. However, as we indicated above, the letter, as it now stands, is only admissible for purposes of showing the state of mind of the declarant.

■ The remaining evidentiary question involves hearsay testimony as to statements made by Flaherty of Minnesota-Onan, Mages, Onan distributor in Chicago, and Stockberger, Onan distributor in Indiana, and the two letters of Shane and Slone. As previously noted, all of this testimony was received solely for the purpose of showing the state of mind of the declarant. Upon a prima facie showing that a conspiracy existed and that the declarant was a part of the conspiracy, the statements become admissible against all co-conspirators as substantive evidence. Flintkote Company v. Lysfjord, 246 F.2d 368, 386 (9th Cir. 1957); Schine Chain Theatres v. United States, 334 U.S. 110, 117, 68 S. Ct. 947, 92 L.Ed. 1245 (1948). But the existence of a conspiracy in this case is the essence of plaintiff's charges of refusal to deal. Therefore, we must discuss the merits of this issue.

■ A conspiracy is a combination or agreement of two or more entities to commit an unlawful act or to commit a lawful act in an unlawful manner. In this case defendants are accused of engineering a conspiracy of Onan distributors together with the manufacturer to refuse to deal with plaintiff. Unlike the Ford Motor case, supra, there is no written document from a named defendant to suggest such an agreement between the parties. Although no actual agreement need be shown, as discussed earlier in this opinion, there must be some indication that concerted action was urged or contemplated. The only testimony that goes to this point indicated that Earhart, an Onan zone manager, complained to Thompson of Electric Equipment that sales to plaintiff were hurting the new distributor in Detroit. But Thompson clearly testified that he did not interpret this complaint as a threat and continued to sell to the plaintiff without incident. We do not interpret this testimony to be an invitation by Onan to join in a conspiracy to boycott sales to plaintiff. There is no other substantive evidence to show any pressure by Onan on distributors not to deal with plaintiff. There is a complete void as to any proof that Carroll-Stuart or any of the individual defendants encouraged any distributor or Onan, itself, not to deal with plaintiff.

There is an element of parallel conduct among the distributors in that most of them ultimately ceased doing business with plaintiff. But the manner in which they dealt with plaintiff varied widely and their reasons for the cessation of sales differed. Electric Equipment sold large quantities of goods to plaintiff and terminated sales only when it stopped handling the Onan line. Mages sold a substantial amount to the plaintiff before terminating. Flaherty sold to plaintiff for a considerable period of time.

As to business dealings between Carroll-Stuart and plaintiff, the loss of plaintiff's employees and its distributorship to Carroll-Stuart must have had an adverse effect on any relationship established between plaintiff and Carroll-Stuart. In fact there was evidence that Mr. Hopkins used vile and abusive language when talking to Mr. Kaufman and other employees of Carroll-Stuart. Thus we find that any actions of Carroll-Stuart which could be interpreted as refusals to deal with plaintiff were the result of personalities and a poor business relationship between these two parties.

 In considering those statements admitted solely to show the state of mind of the declarant, the court concludes only that many distributors, for various individual reasons, did not wish to deal with plaintiff. We do not draw any inference from these statements that these individuals were a part of or even aware of any conspiracy not to deal with plaintiff.

Although the testimony of Hopkins, Stageberg and Jordan casts some suspicion on the activities of defendant, Onan, and a few of its distributors, nevertheless, we are not inclined to credit such testimony insofar as it was refuted by other testimony. Thus as to this issue, we conclude that plaintiff has not established by a preponderance of the evidence that the alleged coconspirators including the defendants entered into an agreement, tacit or explicit, to refuse to sell to plaintiff. The evidence of parallel conduct is insignificant when viewed in light of all the circumstances surrounding each refusal to deal. No inference of conspiracy can be drawn. The statements discussed above, therefore, cannot be admitted for more than the limited purpose already indicated. Thus, we hold that plaintiff has failed to meet its burden of proof in the establishment of a conspiracy to refuse to deal with plaintiff in violation of the Sherman Act.

In addition we note that defendants' case was supportive of this result. As indicated above in the statement of facts, much of the testimony introduced by defendants gave additional business reasons for the decisions of these distributors to discontinue sales to plaintiff. Thus, in considering the case upon all the evidence we reach the same conclusion.

Plaintiff also asserted in the complaint and in the pretrial order that defendants discriminated in the prices they quoted and sold to the plaintiff in violation of 15 U.S.C. 13(a), otherwise known as the Robinson-Patman Act. But in final arguments to this court, plaintiff's counsel assured the court that plaintiff no longer maintained that violations of the Robinson-Patman Act had occurred.

 Nevertheless, if any of the defendants together with the other Onan distributors sold to plaintiff, but only at discriminatory prices, their actions could constitute a concerted refusal to deal. In general, Onan suggests through its DZ8 schedule that distributors of Onan parts give the following discounts: to stocking part dealers, 30% off list for "A" parts; 25% off list for "B" parts; and 20% off list for "C" parts. To non-stocking dealers of parts, Onan suggests discounts from list of 25% on "A" parts, 20% on "B" parts, and 15% on "C" parts. But Kaufman of Carroll-Stuart testified that his distributorship gives discounts to dealers of 20%, 15% and 10% on A, B and C parts respectively, to high volume buyers of 25%,

20% and 15% on A, B and C parts respectively, to the government of 45% off list, and to anyone with a sales license 10–15%.

In selling parts to plaintiff, Carroll-Stuart's allowance of discounts varied. In July of 1965, Carroll-Stuart notified plaintiff that it would sell to plaintiff for cash and a 10% discount. PX16. In September Carroll-Stuart notified plaintiff that it would receive discounts of 25%; 20% and 15% on A, B and C parts. PX17. In October of 1965 Carroll-Stuart notified plaintiff that it would receive no discount from list. PX18. To the extent Carroll-Stuart sold to plaintiff at list prices while selling to persons "off the street" with a sales license at a 10% discount, defendant Carroll-Stuart did treat plaintiff differently. But so long as this merely constitutes an isolated instance of different prices to plaintiff, there is no anti-trust violation of a concerted refusal to deal.

As to the other Onan distributors, Mages of Illinois sold plaintiff parts at discounts of 30%, 20% and 15% on A, B, and C parts. Plaintiff introduced no evidence of how he treated other customers. Electric Equipment of Muskegon gave 30% on A parts and lesser discounts on B and C parts during 1965. In March of 1966, it made sales to plaintiff at 10% to 5% over cost. Evidence of discounts on sales to other customers was not introduced. Plaintiff's case did not indicate what discounts were given by Minnesota Onan. In his deposition introduced by defendants in their case, Mr. Flaherty indicated that he made only 5 to 10% profit on items sold to plaintiff. This was consistent with or more favorable than his dealings with other customers. Plaintiff bought a considerable amount of goods from Morley-Murphy distributor, but no evidence of prices was introduced. McDonald of Cleveland offered to give plaintiff a dealer's discount. Whatever prices and discounts were suggested by Slone of Cincinnati and Shane of Pittsburgh, no evidence of their treatment of other customers was introduced so as to indicate discriminatory charges to the plaintiff.

From this evidence, we cannot infer that there was any concerted plan to charge plaintiff discriminatorily high prices. The only evidence of special treatment of plaintiff appears in sales by Carroll-Stuart to plaintiff. The differentiation in price between plaintiff and other customers was only 10%, an unpretentious amount. Furthermore, evidence of ill feelings between plaintiff and the Carroll-Stuart corporation could easily account for the higher prices. Testimony at trial by Kaufman indicated that Mr. Hopkins used abusive language over the phone to personnel at Carroll-Stuart. We credit that testimony.

Plaintiff also points to evidence that Flaherty, of Minnesota Onan, and Mages, of the Chicago distributorship, required plaintiff's orders to be shipped from Onan's factory to their distributorship and from there to plaintiff, adding additional freight charges to plaintiff's cost of procuring the item. However, we do not infer any bad motive from these actions. Mages testified for defendant that he handled all of his orders in this manner.

Thus we find no indication of a concerted effort to raise plaintiff's cost of procuring items to an unreasonable level.

Plaintiff also alleges that defendant Carroll-Stuart interfered with plaintiff's customers. The basis of this allegation lies in an incident involving a bid made to the Southeastern Electric Company on a generator to be used at Woman's Hospital. Harry Hennequin, a one time employee of plaintiff, submitted a bid on behalf of plaintiff to Southeastern Electric for a generator shortly before he left the employ of the plaintiff in June of 1965. After joining Carroll-Stuart he submitted a bid to Southeastern Electric for the same generator on behalf of Carroll-Stuart in early July, 1965. Hennequin testified that he thought the bidding was still open on

the generator and he considered the order fair game. He told Stuart that "the job was still up for grabs." He did not know until after Carroll-Stuart received the purchase order from Southeastern Electric, PX39, that plaintiff had originally been awarded the contract and given a purchase order by Southeastern Electric. In other words Hennequin denied that he caused Southeastern Electric to cancel any agreement with the plaintiff.

Hennequin also denied that he told Southeastern Electric that plaintiff could not supply any goods, that Carroll-Stuart was an exclusive distributor, that plaintiff would soon be out of business, or that plaintiff could not keep up warranty work on the generator. Hennequin testified that neither Kaufman nor Stuart told the witness to solicit plaintiff's customers and also testified that when he left the plaintiff, he turned in his "Call Book" with the list of plaintiff's customers.

One other incident occurred in which plaintiff accused defendant Carroll-Stuart of attempting to steal a customer or a contract from plaintiff. Plaintiff had a contract with the Birmingham Post Office awarded July 1, 1965. PX14. Darrell Hargrove, an employee of the post office, testified that he crossed out plaintiff's name and wrote in "Carroll-Stuart" on page 3 of PX14 after he overheard a conversation. The contents of the conversation were not admissible. Hargrove also testified that after he overheard the conversation, he went over to Carroll-Stuart to discuss the purchase of Onan parts. While at Carroll-Stuart someone named Ed told him that when plaintiff's inventory of parts expired, plaintiff would have no more Onan parts. Nevertheless, Hargrove and the post office continued to deal with plaintiff under their contract.

In the first incident involving Southeastern Electric there is no indication that Hennequin or anyone else associated with Carroll-Stuart knew about the acceptance of plaintiff's bid by Southeastern; nor is there any indication defendants Hennequin and Carroll-Stuart Corporation spread any rumors of gloom and doom about plaintiff.

We thus find no indication of interference with the relationship between plaintiff and Southeastern. The conduct of Mr. Hennequin is consistent with fair competition between businessmen.

As to the second incident, Carroll-Stuart did not in fact obtain a contract with Birmingham Post Office since the post office continued to deal with plaintiff. The statements which led to Hargrove placing "Carroll-Stuart" on the contract were not admissible and thus there is no indication that any of the defendants were responsible for Hargrove's actions. Although Carroll-Stuart's employee, Ed, (probably Ed Urban) told the witness that plaintiff would soon be out of Onan parts, we do not find this one incident to be sufficient evidence from which to find interference with contractual relations. Moreover, plaintiff and the post office continued to deal under the contract.

Next, plaintiff alleges that defendant Carroll-Stuart pirated away plaintiff's employees to work for defendant to the detriment of plaintiff. It is clear that all, but two employees of plaintiff, Delores Zaluski and Walchesky went to work for defendant Carroll-Stuart. We will discuss the actions of each employee separately.

Stuart Kaufman, an individual defendant in this case, worked for plaintiff as parts manager and then as general manager before going with Carroll-Stuart as general manager in July of 1965. He testified that he was offered a job with Carroll-Stuart by Arthur Stuart in June of 1965 while Kaufman was in the hospital. Kaufman went on to testify that he had nothing to do with the move made by the other employees. He learned that Hennequin and Urban and the mechanics were going to Carroll-Stuart while he was in the hospital.

Donald Earhart, zone manager of Onan for Eastern Michigan, testified that when Kaufman asked him about a

job with the new distributor, he told Kaufman to talk to Mr. Stuart. Earhart also stated that he had no discussion with Onan or with Stuart about offering plaintiff's employees employment with the new distributor. There was no indication that Earhart participated in any plan to hire away plaintiff's employees.

Harry Hennequin testified that on the day of the termination he asked Earhart about employment with the new distributor. Earhart told him to talk with Carroll-Stuart. Hennequin testified that Mr. Hopkins dismissed him from employment and that Hopkins told him to go to work for Carroll-Stuart, which he did. In addition, he stated that he learned about Mr. Kaufman's employment with Carroll-Stuart from Mr. Stuart following his dismissal by plaintiff.

Ed Urban testified that he asked Kaufman in the hospital if he was included in the "package deal" of employees going from plaintiff to Carroll-Stuart and Kaufman said yes. Urban indicated that he learned of the other employees' employment from Kaufman that day. He also testified that he left plaintiff because he, Urban, was ill and that he could not handle the job of parts manager that plaintiff wanted him to assume. He also indicated that his wife worked for Carroll-Stuart. Urban also feared that the loss of Hennequin and Kaufman would ruin plaintiff's business. All of these factors contributed to his decision to leave plaintiff.

There was also testimony by Hopkins and Kaufman that other employees, namely, Gonzales and Day, also left plaintiff to go with Carroll-Stuart. In short, all employees except Delores and Walchesky went with Carroll-Stuart. No specific evidence as to Gonzales and Day was available.

No evidence of interference by Onan with the employees was shown. Only Carroll-Stuart, Kaufman, Hennequin, or Arthur Stuart could have been responsible. And yet there is no indication of any agreement or of any encouragement or suggestion being made by any one of these defendants to plaintiff's employees about switching jobs. The only evidence available indicates that individual decisions to switch employment were made. We do not find that defendants were responsible in any way for the end result.

■ Plaintiff also alleges that defendant, Onan, imposed illegal territorial restrictions on its distributors. The law is clear that

" . . where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results." United States v. Arnold, Schwinn & Co., 388 U.S. 365 (1967) at p. 379, 87 S.Ct. 1856, at p. 1865, 18 L.Ed.2d 1249 (emphasis the Court's).

In the case at bar, defendant, Onan, clearly sold its products to its distributors and relinquished dominion over its products. Therefore, proof of territorial restrictions by Onan on resale of goods by its distributors would present serious consequences.

The evidence indicates that defendant, Onan, designates only one distributor in a geographical area. For example, plaintiff's contract with Onan dated February 28, 1961, indicates that plaintiff was the only Onan distributor for the eastern half of the Lower Peninsula of Michigan encompassing thirty-five counties. At the time the agreement was signed, plaintiff was limited to resale of products bought from Onan in the described sales area. But on January 22, 1962, Roy Mullin wrote a letter, PX44, to plaintiff indicating that recent Supreme Court decisions had "invalidated" the concept of "exclusive territories." Mullin attached to his letter an amendment, a part of PX1, to the contract which modified paragraphs one and nine of the contract. Paragraph one modified language permitting sales "within and only within the sales territory . . ." to language permitting sales "in the sales territory." The

Amendment struck the first sentence of paragraph nine which read,

"9. Distributor agrees that he will not do business with dealers located outside his sales territory nor solicit orders or make sales outside his territory unless the product is shipped for installation and use within his sales territory."

 The question is whether or not Onan required its distributors to abide by the above quoted sentence of paragraph 9 despite the adoption of the amendment. The mere designation of a sales area does not affront the anti-trust doctrine, but the limitation of sales to customers in that area does. The contracts of plaintiff and of Carroll-Stuart with Onan contained sales territory designations. But neither specifically limited sales of Onan products to that sales territory.

Various witnesses at the trial of this case testified as to territorial sales limitations. Donald Earhart, zone manager for Onan, including Michigan's Lower Peninsula, testified that Onan had no policy of preventing distributors from selling outside their designated sales territory. L. D. Thompson, of the Muskegon distributorship, testified that he sold about $60,000 worth of Onan products to plaintiff who was outside their territory. Thompson, however, also testified that Earhart asked him not to sell outside his sales territory. But Thompson continued to sell to plaintiff, a customer outside his territory, without incident.

Grant Stageberg, a one time employee of Minnesota Onan, testified as to statements made to him by William Flaherty, vice-president and general manager of Minnesota Onan. These statements were admitted only to show the state of mind of the declarant, Flaherty. According to Stageberg, when plaintiff's first order for current parts came to Minnesota Onan, Flaherty did not fill the order and alluded to the fact that plaintiff was situated outside his territory. In two other instances involving orders from plaintiff in June and November of 1965, Flaherty allegedly indicated that he would sell to anyone over the counter, but that he would not ship orders for current parts outside his territory. Stageberg also stated that Flaherty felt that outside sales or shipments would endanger his franchise. Stageberg also testified that sales to plaintiff were written up as cash sales and that this procedure kept plaintiff's name off of the company's books.

Arthur Jordan, an Indiana distributor of Kohler products and a friend of Mr. Hopkins, testified that he attempted to obtain Onan plants and parts for plaintiff. Jordan's testimony as to statements made by Stockberger, an Indiana distributor of Onan, and Nelson, zone manager of Indiana for Onan, are admitted only to show the state of mind of the declarants. Jordan testified that Stockberger indicated he would sell to Jordan, but not the plaintiff. However, it is not clear from this testimony whether Stockberger didn't want to deal with plaintiff because he was outside his sales territory or because of some other reason. In late 1967, Jordan received a quote from plaintiff on an Onan generator. He subsequently received a telephone call from Nelson. Nelson allegedly stated to Jordan that he should buy the generator from the Elkhart, Indiana, Onan distributor. Nelson also told Jordan that he would "put a plug in" and prevent Jordan from purchasing the generator from anyone but the Elkhart distributor.

The defendants introduced the depositions of William Flaherty and Charles McDonald. They also placed Edwin Swenson and Loren Mages on the stand. Flaherty of the Minnesota Onan distributorship testified that he never told Stageberg not to deal with plaintiff or that sales to plaintiff would endanger his franchise. He also stated that he doubted that sales outside his sales territory would endanger his distributorship.

Edwin Swenson, Eastern Regional Manager for Onan, testified that distributors are free to sell outside their

sales territory and that, in fact, it was done all the time. Charles McDonald, the Cleveland distributor, testified that he was never told by Onan not to sell outside his sales territory. In fact, McDonald does sell outside his territory and other distributors sell in his territory. Loren Mages of the Chicago distributorship also testified that he advertised in national magazines and sells outside his sales territory while other Onan distributors sell to customers within his territory.

Although plaintiff's proofs raise some suspicion of territorial restrictions, the proofs are insufficient to establish that Onan created or enforced territorial restrictions. Even if plaintiff's proofs constituted substantial evidence of territorial restrictions, the testimony presented by the defendant clearly counters any such conclusion and thus the court finds that plaintiff has failed to establish by a preponderance of the evidence that Onan had engaged in illegal territorial restrictions.

Lastly, plaintiff accuses defendants of price fixing. Plaintiff relies upon three pieces of evidence, (1) the DZ8 schedule published by Onan, which suggests discounts to be given by distributors to dealers, (2) a letter sent by defendant, Carroll-Stuart, on September 2, 1965, indicating that "in response to call from the ONAN Corporation" Carroll-Stuart would sell to plaintiff at certain suggested discounts, and (3) a speed letter, PX47.

Despite the publishing of the DZ8 schedule, the testimony in this case clearly shows that each distributorship had devised its own system of granting discounts. The evidence of discounts charged by distributors is summarized in the section of this opinion on discriminatory prices. Moreover, there was no evidence that Onan attempted to enforce these suggested discounts. No testimony of threats to cancel for failure to follow the schedule was introduced; no distributor was shown to have been terminated for failure to follow the schedule. Nor was there evidence of parallel behavior.

Although the letter of Carroll-Stuart dated September 2, 1965, indicates a suggestion by Onan of a discount schedule to be given plaintiff, there is no indication of coercion by Onan. Moreover, we note that these discounts suggested by Onan were actually favorable to the plaintiff inasmuch as previous discounts to plaintiff had been considerably less. Secondly, it is clear that Carroll-Stuart did not feel obliged to follow the suggestions of Onan. On October 12, 1965, Carroll-Stuart notified plaintiff that no discounts would be given on sales to plaintiff.

Plaintiff sought to introduce a document known as a speed letter [7], PX47. The exhibit includes the yellow carbon copy of the speed letter retained for plaintiff's files and another carbon copy returned to plaintiff by Onan containing the reply of one of Onan's employees. In summary, Hopkins' portion of the letter, addressed to "Bud Stano, Parts Mgr. Onan Division, Studebaker Corporation", requests information about a product which Onan sells. At the end of this inquiry the letter goes on: "I thought you were going to try to do something about getting us the going Resale Discount (sic) We can hardly exist on List Prices." The response handwritten on the bottom of the page reads as follows, "Al—This is an accessory item listed in MPB & price was increased to $65.00 . . . on 8/24/65. /s/ Bill Erickson." The exhibit was introduced for the purpose of showing that Onan did attempt to fix prices on the theory that failure to deny a portion of a letter in a reply to that letter gives rise to a presumption of truth. Thus, plaintiff would have the court presume

---

7. A speed letter is an apparatus containing three pages. A message is typed on the first page with carbon paper transmitting the message onto the two copies. One copy is retained in the sender's files. The original and the other copy are mailed to the addressee. The addressee returns one copy to the sender with his reply thereon.

from this exhibit that Mr. Stano did promise to obtain resale discounts for plaintiff.

Defendants object to the introduction of this exhibit on the grounds that it is self-serving and that since Mr. Stano is deceased, the dead man's statute would prevent a presumption from being made.

The only authority directed to the court goes to the propriety of such a presumption. Plaintiff cites the case of Boerner v. United States, 117 F.2d 387 (2d Cir., 1941), in which the court held proper the receipt of letters addressed to the plaintiff which were unanswered. The court there was asked to admit them for the same purpose as proposed in the case at bar, i. e., that the statements contained in the letters were true. Although the court approved of their admission, the court stated that a definite rule on allowing such a presumption to be drawn from "failure to reply in writing to a written communication" would be impracticable and that instead each case should stand on its own facts. The court had rather strong facts to rely on in *Boerner*. The plaintiff had admitted the misappropriation of certain mail. The government then sent three letters to plaintiff stating that investigation had led to discovery of additional missing parcels for which plaintiff was responsible. Under these circumstances the court felt plaintiff's failure to reply was relevant and allowed introduction of the evidence.

In the case at bar we have a letter sent to one person, Stano, and replied to by another, Erickson. Even if we were willing to accept plaintiff's theory, the fact that someone other than the addressee replied weakens the presumption. Nevertheless, plaintiff asks us to presume that Stano promised to obtain the going resale discount for plaintiff from Onan distributors and then to infer that Onan engaged in price fixing. Under the circumstances presented here, we decline to draw the presumption from this exhibit urged upon us by plaintiff.

Thus, we find no evidence of price fixing by Onan or any of the other defendants.

For the reasons stated above, the complaint will be dismissed as to all defendants. An appropriate form of judgment shall be submitted.